## Commonwealth v. Phila. & Erie R. R., Appellant.

[Marked to be reported.]

*Taxation—Railroads—Corporations—Net earnings—Operating expenses —Effect of lease.*

The net earnings of a railroad company are the excess of the gross earnings over the expenditures defrayed in producing them, aside from, and exclusive of, the expenditure of capital laid out in constructing and equipping the works themselves.

Rental paid for the use of rolling stock and equipment, which is hired by a railroad company and not owned, is part of the operating expenses, and should be deducted from the gross earnings in order to ascertain the net earnings for purposes of taxation.

The fact that the lessor and lessee regulated the rental by an annual percentage on the cost of the rolling stock and equipment, is immaterial.

*Taxation—Exemption—Statutes — Repeal—Acts of Feb. 10, 1852, and June 7, 1879—Obligation of contract.*

A mere general law without negative words cannot repeal a previous special statute, although the provisions of the two acts are different.

The exempting clause of the act of Feb. 10, 1852, P. L. 42, was not repealed by the general taxing law of June 7, 1879, P. L. 112.

It seems that the proviso of the act of Feb. 10, 1852, P. L. 42, exempting the Philadelphia & Erie Railroad Company from taxation upon its stock "until the net earnings of the company shall realize at least six per centum per annum upon the capital invested," is not a mere gratuity, but a contract, and the exemption cannot be taken away by the commonwealth.

*Exemption from taxation—Lease.*

Where a railroad company leases its railroad to another company, but retains its own separate and independent existence, its own capital stock and its own officers, it does not lose the benefit of a statute exempting it from taxation, passed prior to the execution of the lease.

Argued May 28, 1894. Appeal, No. 33, May T., 1893, by defendant, from judgment of C. P. Dauphin Co., Jan. T., 1892, No. 492, in favor of Commonwealth on appeal from tax settlement. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Reversed.

Appeal from tax settlement.

The settlement appealed from was as follows :

Appraised value of capital
  common stock,    .    . $4,785,000.00
        Tax three mills,                             $14,355.00
Dividend seven per cent on
  special stock,    .    .    2,400,000.00
        Tax three and one half mills (one
           half mill for each one per cent
           of dividend),   .    .    .    .       8,400.00
                                                 _____
    Due Commonwealth,    .    .    .    $22,755.00

The facts were found as follows by SIMONTON, P. J.:

" This case was by agreement of the parties tried by the court, in accordance with the act of April 22, 1874. It originated in an account settled by the auditor general and state treasurer, December 9, 1891, against the corporation defendant, for tax on capital stock, under the act of June 7, 1879, for the year ending the first Monday of November, 1888, for $22,755 ; from which settlement defendant appealed to this court, as provided by the act of March 30, 1811, relative to public accounts.

"1. The defendant was incorporated as the Sunbury and Erie Railroad Co. by a special act passed April 3, 1837, with an authorized capital of $6,000,000, with authority to locate, construct and operate a railroad from Sunbury, via Williamsport, to the harbor of Erie, a distance of about 287 miles, over a route much of which was then an almost unbroken wilderness, crossing the Allegheny range of mountains, and through a region not traversed by any other railroad.

" 2. Soon after its incorporation, the company defendant was organized and proceeded to survey its route and locate its road ; but for want of sufficient means, comparatively little of its stock having been subscribed prior to February 18, 1852, not much progress was made in the construction of its road.

" 3. By an act entitled ' A supplement to the act incorporating the company defendant, passed February 10, 1852,' P. L. 42, the corporate or constituted authorities of any municipal or other corporation in the commonwealth were authorized to subscribe for shares in the capital stock of the corporation defendant, and to pay for the same by issuing certificates ·of loans, or bonds, bearing an interest of six per cent per annum ; and the company defendant was authorized to pay interest to shareholders at the rate of six per cent per annum, with the proviso ' that interest shall not be paid upon any share of stock upon which any installment which has been called ·for remains unpaid : Provided further, That the stock of the said company shall not be subject to any tax in consequence of the payment of the interest hereby authorized, nor until the net earnings of the company shall realize at least six per centum per annum upon the capital invested.' This act was accepted by the stockholders of the company defendant February 13, 1852, and it is hereby referred to and made part of this finding.

" 4. A further supplement to the act incorporating the defendant was passed March 27, 1852, P. L. 186, of which section 11 is as follows : ' That inasmuch as the construction of this railroad will tend to develop the resources and increase the revenue of the commonwealth, the property which the said president and managers hold or may acquire under the charter for the benefit of the stockholders, shall be exempt from taxation for said purposes until the road is completed : Provided, That such exemption shall not extend to a period longer than five years from the passage of this supplement.' This act was accepted by the stockholders of the corporation defendant May 12, 1852, and it is hereby referred to and made part of this finding.

" 5. After the acceptance of the act of February 10, 1852, the company defendant opened new stock subscription books, and placed on the first page of each a printed slip containing a copy of section 2 of said act, and numerous individuals subscribed, and the following stated municipal subscriptions

were made in said books, namely: by the city of Philadelphia $2,000,000; district of Richmond $255,000; county of Erie $200,000; city of Erie $300,000; county of Warren $150,000; making a total of municipal subscriptions of $2,905,000, which were paid within a reasonable time thereafter, and the sums thus obtained were applied by the company defendant to the construction of its railroad.

" 6. The act passed March 7, 1861, provided that the corporate name of the defendant should be 'changed to The Philadelphia and Erie Railroad Co., by which name and title the business of said company shall be hereafter managed, with the same effect as if the name thereof had not been changed.'

" 7. The company defendant completed the construction of its railroad in 1864 with the aid of the Pennsylvania Railroad Co., which had previously, in 1862, become the lessee of said railroad in its unfinished state; and said road has ever since, in accordance with the terms of said lease, been managed, controlled and operated, and the rates of tolls, freights and charges have been regulated and determined by said Pennsylvania Railroad Co., which has at all times, since the date of the lease, furnished and owned the equipment of said road. This lease (for 999 years) is made part of this finding.

" 8. In January, 1870, another lease from the company defendant to the Pennsylvania Railroad Co. was substituted for the lease above referred to, and contained, inter alia, an agreement that the lessee should charge the lessor interest at a rate not exceeding seven per cent upon the cost of the equipment so owned and furnished by the said lessee. The interest on the cost of the equipment used on the road in 1888 was $168,403.75. This lease is hereby referred to and made part of this finding.

" 9. By an act passed March 9, 1865, P. L. 291, the corporation defendant was authorized to issue bonds not exceeding in amount $3,000,000, bearing interest at the rate of seven per cent per annum, to be secured by a mortgage on defendant's railroad, and to be convertible into special stock. Thereafter defendant issued $2,400,000 of said bonds, and they were afterwards converted into special stock, and this is part of the capital stock taxed in the settlement appealed from in this case. This act was accepted by the company defendant March 20, 1865, and is hereby made part of this finding.

" 10. The officers of the corporation defendant reported, as required by law, to the secretary of internal affairs in 1888, that the cost of the construction of defendant's railroad up to December 31, 1888, was $26,186,163.35, and the net earnings for the year 1888 were $1,655,850.20. The amount charged for interest on equipment furnished by the lessee under the lease of January 1, 1870, for the year 1888, was $168,403.75 ; and the cost of maintaining the organization of the company defendant for the year 1888 was $8,000. The charge for interest as above stated was not deducted from the net earnings, nor reckoned as part of the expenses of operating the road in the report above referred to.

" 11. In response to a call from the auditor general, the treasurer of the company defendant, November 27, 1888, made a report of the capital stock of the corporation defendant, as required by law, showing the total capital stock to be $10,375,000, of which $2,400,000 were stated to be special stock, and $7,975,000 common stock, and appraising the common stock at $30.00 per share, amounting to $4,785,000, but failing to appraise the special stock and to state that a dividend had been made upon it. We find, however, that a payment of seven per cent was made during said year by the company defendant upon said special stock. This report was accompanied by a letter from said treasurer to the auditor general, calling his attention to the act of February 10, 1852, claiming exemption from taxation under said act, and stating ' as this company is not in a position to pay interest on capital invested, it is not liable under the law quoted.' Thereupon the auditor general and state treasurer settled an account against the defendant for tax on capital stock, charging it at the rate of three mills on $4,785,000, the appraised value of its common stock, amounting to $14,355, and three and one half mills (being one half mill for each one per cent of dividend) on $2,400,000, the par value of its special stock, amounting to $8,400, making the total tax $22,755, from which settlement defendant appealed, as above stated. There is no evidence in the case tending to show whether the auditor general and state treasurer did or did not claim that the company defendant was liable for tax on capital stock for years prior to 1888, nor any evidence to show that any other account than the one now in question was ever settled against defend-

ant for the year 1888, and we therefore find that none was settled for this year.

"The company defendant claims in the specifications of objections filed with the appeal, that its net earnings did not, in 1888, or in any year prior thereto, realize six per cent on the capital invested; that therefore its capital stock is exempted from taxation by the supplement of February 10, 1852; that this exemption is in the nature of a contract; and that any subsequent taxing act purporting to repeal it would be repugnant to the clauses of the constitution of the United States and of this state, which prohibit the passing of any law impairing the obligation of contracts."

The court held that the exemption clause of the act of Feb. 10, 1852, had been repealed by the act of June 7, 1879, or if it was ever valid it has ceased to exist by reason of the lease; and also that the rental paid for the use of rolling stock and equipment should be treated as if it were interest upon money borrowed to purchase such equipment and rolling stock.

Exceptions to the findings of facts and conclusions of law were overruled, and judgment was entered in favor of the commonwealth, for the full amount claimed.

*Errors assigned* were rulings as to rental paid for rolling stock, effect of lease, and construction of statutes.

*Louis M. Hall, Francis Jordan* with him, for appellant.—The rental for equipment should not be considered as interest on money borrowed, to ascertain net earnings: Anderson's Dic. of Law, 708; St. Johns v. Erie Ry. Co., 22 Wallace, 148.

The tax exemption clause in the act of Feb. 10, 1852, was not repealed by the act of 1879.

The original charter of the company and the two supplements of 1852, all promptly accepted by the company when enacted, established such a contract between the state and the company as the legislature could not repeal: U. S. Const., art. 1, § 10; Pa. Const., art. 1, § 17; Fletcher v. Peck, 6 Cranch, 87 and 133; Dartmouth College v. Woodward, 4 Wheat. 518, 629; Cooley, Const. Lim. *274, 275, 280, 281; Booth on Street Ry. § 8; R. R. v. Alsbrook, 146 U. S. 279; 3 A. &. E. Ency. L. 746; Com. v. R. R., 58 Pa. 26; Bank v. Pittsburg, 37 Pa. 340;

Wagner Free Institute v. Phila., 132 Pa. 612; Com. v. Water
Co., 94 Pa. 516 ; Brown v. Comrs., 21 Pa. 37 ; U. S. v. Walker,
22 How. 297 ; Endlich on Int. of Stat., ch. 8, p. 280 ; State v.
Ober, (S. C. of La.) 14 Rep. 330 ; Indiana v. Milk, (U. S. C.
C.) 13 Rep. 709; Hans v. Louisiana, 134 U. S. 1 ; Mott v. R.
R., 30 Pa. 9.

The law presumes that public officers do their duty: Tel. Co.
v. Com., 3 Brewster, 517.

A statute of uncertain meaning, which has been enforced in
a certain sense for a long series of years by the different de-
partments of government, will be judicially construed in that
sense : 26 Alb. L. J. 315 ; U. S. v. R. R., 142 U. S. 615 ; End-
lich, Int. Stat., ch. 13 ; U. S. v. Ry., 150 U. S. 1.

*James A. Stranahan,* deputy attorney general, and *W. U.
Hensel,* attorney general, for the Commonwealth.—The exemp-
tion claimed does not exist, for the reason that it was not
granted in the charter of defendant company, and is therefore
no part of the contract between the commonwealth and defend-
ant, but is a mere gratuity which the legislature could with-
draw at pleasure, and it did withdraw it by passing the act of
June 7, 1879, taxing the capital stock of all railroad corpora-
tions : Imp. Co. v. Com., 69 Pa. 140 ; Hospital v. Phila., 24
How. 302; Tucker v. Ferguson, 22 Wall. 527 ; R. R. v. Super-
visors, 3 Otto, 395.

The general taxing acts of 1859 and 1868, as well as the
constitution of 1874, and subsequent revenue acts, have re-
pealed all special exemptions : Com. v. R. R., 2 Pearson, 389 ;
Com. v. R. R., 55 Pa. 452; Com. v. Imp. Co., 69 Pa. 140 ;
Twp. v. Berger, 2 Pearson, 230.

The exemption clause in the act of Feb. 10, 1852, is in pari
materia with § 11 of the act of March 27, 1852, and § 4 of the
act of May 21, 1857, and they should all be read together.
And so read they do not show any intention of the legislature
to give any exemption of the stock or property of defendant
after May 21, 1867.

Net earnings of a company are the product of the business,
deducting the expenses only: Com. v. Penn Gas Coal Co., 62
Pa. 241 ; R. R. v. U. S., 99 U. S. 420 ; Memphis v. Ensley, 6
Baxt. 553 ; Bank v. State, 9 Yerg. 490 ; People v. Niagara, 4

Hill, 20; People v. N. Y., 18 Wend. 605; New Orleans v. Hart, 14 La. 803; New Orleans v. Fassman, 14 La. 865.

OPINION BY MR. JUSTICE GREEN, Oct. 1, 1894:

The learned court below found specifically that "If the net earnings are what remains after the operating expenses and the amount charged for interest on equipment have been deducted, the net earnings did not, in 1888, amount to six per cent on the capital invested; but if the net earnings are the gross receipts, less operating expenses only, the net earnings were more than six per cent." The designated sum of money which constituted the amount paid for the use of the equipment was $168,403.75, and the learned court below decided that this could not be regarded as a part of the operating expenses of the road and therefore declined to deduct the sum from the aggregate of the gross earnings. We find ourselves unable to agree to this conclusion. The sum paid for the use of the equipment was, by the agreement of the lessor and lessee corporations, determined by an allowance of interest on the entire cost of the equipment. The lessor company did not have an equipment and had not the money to pay for it. It was therefore furnished by the lessee company, and, by the contract of 1870, a reasonable compensation for its use, "not exceeding seven per cent per annum for the capital actually invested in supplies, engines and cars, required and employed," was to be allowed by the lessor company. The subject is thus explained in the testimony: "The equipment was leased from the Pennsylvania Railroad Company. The Philadelphia & Erie did not own their equipment; they leased it from the Pennsylvania Railroad and paid the interest on the valuation. The valuation was changed from time to time, and interest on the valuation was paid. We always considered that as one of the operating expenses, although it was stated partly in the reports of the company. . . . Q. Will you state what rental you paid to the Pennsylvania Railroad Company for the equipment which you so leased during the year 1888? A. First the rental was seven per cent on the valuation, but it was reduced by the Pennsylvania Company to six per cent. I do not remember the exact year in which the reduction was made, but my impression is it was six per cent at the time." The

witness subsequently stated that the amount paid for the year 1888 was $168,403.75. The learned court below thought that this money should be treated simply as interest paid on borrowed capital and that such money cannot be deducted from gross receipts as part of the operating expenses. We do not think so. In actual fact it was not interest on borrowed capital because there was no borrowed capital in the case. The lessor did not borrow the money from the lessee and construct its own equipment, hence it could not be indebted to the lessee for any interest on borrowed capital. The lessee was and continued to be the owner of the equipment, and the lessor paid for the use of it, distinctively as such. It was entirely competent for the parties to regulate the rental to be paid for the use of it by an annual per centage on its cost. Its fundamental character as rental was not changed, but the manner in which the amount of the rental was determined; it was still rental or compensation for the use of the equipment. It is a method of compensation for the use of property and not at all uncommon in the business world. Regarding this sum of $168,403.75, then, as compensation for the use of the equipment, we can see no good reason why it should not be regarded as a part of the operating expenses of the road. Engines and freight cars and passenger cars and the necessary supplies are as essential to the running of the road as rails and cross ties and stations and the supplies necessary to them. The road cannot be run at all without them, and if they have to be hired because the company is unable to own them, we cannot understand why the cost of hiring them should not be regarded as a part of the operating expenses. We are not referred to any authority holding a contrary doctrine. The cases of Commonwealth v. Penn Gas Coal Co., 62 Pa. 241, and Commonwealth v. Ocean Oil Co., 59 Pa. 61, cited by the appellee, are not at all in point. They raise a very different question, but they do recognize and state a proposition with which our conclusion is in entire harmony, to wit, that "net earnings or income, are the product of the business, deducting expenses only." A more comprehensive and accurate definition is the following taken from Anderson's Dictionary of Law, 390: "As a general proposition, the net earnings of a railroad company are the excess of the gross earnings over the expenditures defrayed in

producing them, aside from, and exclusive of, the expenditure of capital laid out in constructing and equipping the works themselves:" St. Johns v. Erie Railway Co., 22 Wall. 148; Railway Co. v. United States, 99 U. S. Rep. 420.

Compensation for the use of equipment, which is hired and not owned, is most certainly part of the expense of producing the business which is transacted, and is therefore a part of the operating expenses. We therefore hold that the sum in question should be deducted from the gross earnings, and, that being done, the amount of net earnings is not equal to six per cent on the capital invested, and the exempting clause of the act of 1852 becomes applicable, unless for some other reason it is unavailable.

The learned court below held that this clause was not applicable because it was repealed, and the argument to establish a repeal, was that, by the general law of June 7, 1879, taxation was imposed upon the capital stock of all railroad corporations, and therefore, although this exemption was special and particular, it was repealed by implication. The question is not discussed in the opinion, but the intention to repeal is assumed, and the question that is discussed is, whether the legislature had the power to repeal.

There are no repealing words in the act of 1879, of the act of 1852, and there is nothing but the usual clause repealing laws or parts of laws inconsistent with the act. But that a mere general law without negative words cannot repeal a previous special statute, although the provisions of the two acts are different, has been so frequently decided that it must be regarded as settled law. In Brown v. County Commissioners, 21 Pa. 37, we said : " It is well settled that a general statute without negative words cannot repeal a previous statute which is particular, even though the provisions of the one be different from the other. . . . It is against reason to suppose that the legislature, in framing a general system for the state, intended to repeal a special act which the local circumstances of one county had made necessary." To the same effect are Malloy v. Commonwealth, 115 Pa. 25 ; Morrison v. Fayette Co., 127 Pa. 110 ; Horner v. Commonwealth, 106 Pa. 221 ; In re Royersford Bridge, 112 Pa. 627 ; Evans v. Phillipi, 117 Pa. 226 ; Malloy v. Reinhart, 115 Pa. 25 ; Hendrix's Account, 146 Pa. 285 ; Trust Company v. Fricke, 152 Pa. 231.

In Commonwealth v. Pottsville Water Co., 94 Pa. 516, we decided that a repealing clause at the end of a public general act repealing all acts inconsistent with it, did not repeal the inconsistent provisions of special acts granting exemption from taxation.

We hold therefore that the exempting clause of the act of Feb. 10th, 1852, P. L. 42, was not intended to be repealed by the general taxing law of 1879, and is therefore yet in force.

The discussion of the question, therefore, whether the legislature had the power to repeal that clause is rendered unnecessary. But were it important to consider that question, we should hold that the granting of this exemption was not a mere gratuity, but was a grant upon the faith of which it was intended by the legislature that subscriptions by other corporations to the capital stock of the Sunbury and Erie Railroad Company should be solicited and obtained. It was an inducement to make such subscriptions, for the benefit not only of the company but of the Commonwealth, that was thus held out, and it would be an act of bad faith, after such subscriptions had been obtained, to take away the inducement by even an express repeal. It would be bad faith to the subscribers, because it would change the conditions upon which their contracts of subscription were made, and it would be bad faith both to the company and the subscribers, because it would diminish the ability of the company to pay either interest or dividends on the stock subscribed. The amount required to pay taxes on the capital stock of the company, if the exemption clause were repealed, would be a most serious impairment of the financial ability of the company, which had never earned money enough, up to 1888, to pay a single dividend to its stockholders, which had with the utmost difficulty been able to sustain its solvency and whose whole corporate life was an incessant struggle for mere existence. This is fully proved by the tabulated statement given in evidence on the trial, showing the condition of the capital stock, common and special, the funded debt, the net earnings, the fixed charges, and the surplus or deficiency, for each year from 1852 to 1888. During much of this time very heavy annual deficiencies were accumulated against the company, showing their inability to pay their fixed charges. After the acceptance by the company of

the act of Feb. 10th, 1852, new subscription books were opened, containing a copy, on the first page, of the second section of the act which granted the exemption, and very large amounts of money were subscribed by individuals and corporations to the capital stock of the company, and several millions of dollars were thus raised. It then became the duty of the company to proceed with the construction of the road, and this they did, until it was completed through its whole length to the city of Erie in the year 1864. The advantage to the commonwealth, of the completion of this great enterprise, was fully recognized and recited in the act of March 27, 1852, P. L. 186, wherein it is declared that " the construction of this railroad will tend to develop the resources and increase the revenue of the commonwealth," and in the fourth section of the supplemental act of 21st May, 1857, P. L. 647, whereby it is enacted " That in consideration of the advantages which the commonwealth will derive from the completion of the said railroad by the improvement of the country through which it will pass, and the consequent increase of the public revenues," the bonds and property of the company, and all municipal bonds issued for stock, shall be exempt from taxation for ten years. It therefore appears that the commonwealth, desiring to have its territory improved, and its revenues increased, contracted with this company, that, if it obtained an increase of its capital so as to complete its road by obtaining municipal and other subscriptions to its capital stock, " the stock of the said company shall not be subject to any tax in consequence of the payment of the interest hereby authorized, nor until the net earnings of the company shall realize at least six per centum per annum upon the capital invested." On the part of the company, it was to obtain, and did obtain, very large additional subscriptions to its capital stock, and in consequence thereof it became subject to a duty, to proceed with, and carry on, the construction of its railroad to the full extent of its increased capital, and this duty was performed during the succeeding years, until in 1864 the entire road was completed. In order to induce these additional subscriptions, the commonwealth promised the company and the subscribers that the whole stock of the company should be exempt from taxation until " the net earnings of the company shall realize at least six per centum per annum upon the capital invested."

The full benefit and advantage of this contract has accrued
to the commonwealth.   Her territory has been vastly improved
over the whole length of the road.   Great business interests
have been established, towns and cities have been built, popu-
lation has largely increased, and a region which was an almost
unbroken wilderness in 1852, when the act in question was
passed, is now a cultivated country, abounding with popula-
tion, pursuing innumerable industries, and contributing im-
mensely to the wealth of the commonwealth and to the increase
of its revenues.   Upon no principle of common justice, of
sound morality, or of settled law, can she be permitted to repu-
diate the contract and deny her obligation.   In our judgment
the grant of exemption from taxation in the act of 1852, was
a. term of a contract, and in no sense a mere gratuity, held out
as a bait to allure innocent citizens and municipalities to part
with their money, and then to deny them the promised consid-
eration upon which it was given.   But the commonwealth has
not expressed any such purpose.   The exempting act of 1852
and the general taxing law of 1879 can easily stand together
and be administered without any conflict and therefore there
is no necessary inference of inconsistency upon which to found
a repeal by implication.

All the law there is in this question has been fully settled
by the decision of this court in the case of Commonwealth v.
Pottsville Water Co., 94 Pa. 516, before cited.   There the ex-
empting language was contained, as here, not in the charter,
but in a supplemental act, and was precisely similar in its char-
acter and almost in its words.   Thus, in that case, the words
were, " The stock in said company shall be exempt from all
taxation whatsoever."   Here the words are, " The stock of
said company shall not be subject to any tax," etc., etc.   In
that case we held that the exemption was binding on the com-
monwealth, and that the tax claimed by the accounting officers
could not be collected.   The same contention was made there
as here, to wit, that a general taxing law passed subsequently
to the exempting act, operated as a repeal by implication.   We
denied that proposition, but we also held that an express repeal
would have been inoperative, because the exemption was part
of a contract and not a gratuity, and was therefore beyond the
power of the commonwealth to repeal.   We then held that an

increase of capital from $50,000 to $200,000 occasioned a resulting increase in the rights and duties of the company to bring water from a greater distance, and introduce it into other towns. We said: "The enlarged duties and obligations imposed by the act substantially created a new corporation. It is no answer to say the corporation was not bound to assume these new powers and duties. That is true, yet it did assume them. Relying thereon it made large expenditures. . . . Although free to accept or reject, yet, having accepted, all the rights and exemptions given by the act follow. The learned judge correctly held the stock of the company exempt from taxation."

Some matters of minor importance are discussed in the opinion of the learned court below and the paper-books, but they need only a brief consideration. The learned judge thought, and so held, that the exemption was a matter personal to the lessor corporation, and was forfeited to it because of the leases made by it to the Pennsylvania Railroad Company. It was considered that the lessor corporation thereby surrendered all its right to control and operate its railroad and to determine its rates of tolls, freights and charges, and that therefore it had no net earnings nor any power to determine the conditions upon which the amount of net earnings depended. We are unable to assent to these conclusions. The reasoning simply results in a question of fact as to what the net earnings were, and if there were any dispute as to that it would have to be determined by testimony and found by the court. But no such question was raised on the trial, and, as we understand, there is no actual controversy now upon that subject. The independent existence of the lessor company has at all times been maintained and still is. It is, and always has been, regarded by the taxing officers as an actual corporation, having its own separate and independent existence, its own officers, its own capital stock, its own funded debt, its own earnings, gross and net, and in all respects a proper subject of taxation. If it can be taxed at all it can only be upon the conditions which the law creates, and subject to the limitations which the law imposes. If the commonwealth has exempted it from taxation in any respect it is entitled to the benefit of such exemption because the exemption is a part of the law under which any tax can be imposed or

collected.　The tax cannot be collected except according to the law which regulates it, and the exemption is a part of that law.

On the whole case we are of opinion that the exemption of the act of Feb. 10, 1852, prevails and that the defendant is not liable to the tax sought to be imposed.　The assignments of error are sustained.

The judgment of the court below is reversed and judgment is now entered for the defendant with costs.